UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

UNITED STATES OF AMERICA,          :          **NOTICE OF MOTION**

    -against-                              :          Docket 07 Cr. 566(GBD)

DAVID WILKINS, et al.,                     :

--------------------------------------------------X

    PLEASE TAKE NOTICE that defendant DAVID WILKINS, and other co-defendants who join this motion, upon the attached Memorandum of Law and Exhibits, moves this Court by his attorney, TONI MESSINA, before the Honorable George Daniels at the United States Courthouse located at 500 Pearl Street, New York, New York, for an order granting the following relief:

1. Suppressing electronic surveillance evidence pursuant to the Fourth Amendment of the United States Constitution and 18 U.S.C. 2515 and 2518.

2. Granting a hearing to determine the audibility of tapes and the accuracy of line sheets;

3. Directing the government to transcribe the intercepted communications and categorize them in specified manners pursuant to the Due Process Clause and the Sixth Amendment of the U.S. Constitution;

4. Directing the Government to disclose various discovery pursuant to Fed. Rule Crim. Proc. 16, thirty days before trial, i.e., a list of exhibits expected to be offered during its direct case; a list of anticipated witnesses; a list of unindicted coconspirators; a summary of expert testimony; and notice of any uncharged

crimes or prior bad acts which it may seek to introduce pursuant to Fed. Rule Evid.

404(b);

5. Pursuant to *Brady v. Maryland*,  373 U.S. 83 (1963), *Giglio v. United States,* 405

U.S. 150 (1972) and their progeny, directing the Government to disclose as soon as

it becomes available any material that is either exculpatory useful for purposes of

cross-examination, or helpful in discovering other material information;

6. Ruling *in limine* that statements contained in the eavesdropping applications,

progress reports and line sheets are admissible against the Government pursuant to

Fed. R. Evid. 801;

7. Granting David Wilkins permission to join all motions on behalf of all co-

defendants to the extent such motions are relevant and applicable herein, and are

not inconsistent with the relief sought herein; and

8. Granting such other further and different relief as this Court may deem just,

equitable and proper.


Dated:  New York, New York
         April 11, 2008

                                            Respectfully submitted,


                                            _____
                                            Toni Messina, Esq.
                                            100 Lafayette Street, Suite 502
                                            New York, NY 10013
                                            646-207-4705


TO:  Clerk of the Court
      United States District Court

Southern District of New York
500 Pearl Street
NY, NY 10007

Hon. George B. Daniels
United States District Court
Southern District of New York
500 Pearl Street
NY, NY 10007

Avi Weitzman, AUSA
U.S. Attorney's Office, Southern District
One St. Andrew's Plaza
NY, NY 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

UNITED STATES OF AMERICA,          :

    -against-                           :               Docket 07 Cr. 566(GBD)

DAVID WILKINS, et al.,                   :

--------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
### DAVID WILKINS PRETRIAL MOTIONS

Toni Messina, Esq.
100 Lafayette Street, Suite 502
New York, NY 10013
646-207-4705

**TABLE OF CONTENTS**

Preliminary Statement……………………………………………………..…   7

Factual Background………………………………………………….............   7

Point I    THE ELECTRONIC EAVESDROPPING EVIDENCE SHOULD BE
           SUPPRESSED ON THE GROUNDS THAT:  (1)THE GOVERNMENT
           FAILED TO ESTABLISH THAT THE WIRE TAP
           WAS NECESSARY; AND (2) THE AGENTS FAILED TO MINIMIZE THE
           INTRUSION.  …………………………………………………..…   8

Point II   PURSUANT TO THE DUE PROCESS CLAUSE AND SIXTH
           AMENDMENT, THE COURT SHOULD DIRECT THE GOVERNMENT TO
           TRANSCRIBE ALL OF THE INTERCEPTED COMMUNICATIONS,
           IDENTIFY THOSE IT DEEMS TO BE EITHER INCULPATORY OR
           EXCULPATORY, INDICATE WHICH TAPES IT INTENDS TO OFFER
           INTO EVIDENCE, AND SPECIFY WHICH CONVERSATIONS
           DEFENDANT EITHER PARTICIPATED IN DIRECTLY OR WAS THE
           SUBJECT OF DISCUSSION BY OTHERS…………………………….………17

Point III  PURSUANT TO THE FEDERAL RULES, THE COURT SHOULD DIRECT
           THE GOVERNMENT TO PROVIDE THIRTY DAYS IN ADVANCE OF
           TRIAL (1) ALL EXHIBITS EXPECTED TO BE OFFERED DURING ITS
           DIRECT CASE; (2) A LIST OF ANTICIPATED WITNESSES; (3) A LIST OF
           ALL UNINDICTED COCONSPIRATORS; (4) A SUMMARY OF EXPERT
           TESTIMONY; AND (5) NOTICE OF ANY UNCHARGED CRIMES AND
           PRIOR BAD ACT EVIDENCE IT MAY SEEK TO OFFER INTO
           EVIDENCE………………………………………………………………20

Point IV   PURSUANT TO *BRADY* AND ITS PROGENY, THE COURT SHOULD
           DIRECT THE GOVERNMENT TO DISCLOSE AS SOON AS IT BECOMES
           AVAILABLE, ANY MATERIAL THAT IS EITHER EXCULPATORY,
           USEFUL FOR PURPOSES OF CROSS-EXAMINATION OR HELPFUL IN
           DISCOVERING OTHER MATERIAL INFORMATION……..……………..23

Point V   THE COURT SHOULD RULE *IN LIMINE* THAT THE STATEMENTS
          CONTAINED IN THE EAVESDROPPING APPLICATIONS, LINE
          SHEETS AND PROGRESS REPORTS ARE ADMISSIBLE AGAINST THE
          GOVERNMENT IN THE EVENT THAT THEY CONFLICT WITH THE
          GOVERNMENT'S TRIAL ALLEGATIONS…………………………………26

Point VI  DEFENDANT REQUESTS PERMISSION TO JOIN THE MOTIONS
          SUBMITTED BY THE CO-DEFENDANTS TO THE EXTENT THAT THEY
          ARE RELEVANT AND APPLICABLE AND FOR ANY OTHE RELIEF
          THAT HE COURT MAY DEEM JUST AND PROPER and DOES NOT

OBJECT TO ANY JOINDER CODEFENDANTS MAKE TO THIS
MOTION……………………………………………………………………...30

Conclusion…………………………………………………………………………..30

## PRELIMINARY STATEMENT

This memorandum is submitted in support of the defendant David Wilkin's application

for an Order:  (1) Suppressing wiretapped conversations; (2) directing the government to

transcribe the intercepted communications and categorized them in specified manners; (3)

directing the government to provide various forms of discovery thirty days before trial,

including a list of exhibits and witnesses; (4) directing the government to disclose *Brady*

material as soon as it becomes available; (5) deciding *in limine*, the admissibility of

various statements by government agents; and (6) granting permission to join in the

motions of the co-defendants to the extent they are applicable.

## FACTUAL BACKGROUND

Defendant David Wilkins was arrested and indicted for his alleged involvement in a

narcotics conspiracy.  His arrest was based in large part on wire-tapped conversations

secured by the Government through a series of affidavits prepared by several DEA agents

between August, 2006 and January, 2007.

The original wire-tap authorization permitted the tapping of a cellular phone belong to

Craig McDuffie, AKA "Large-O."  Most of the information used in all subsequent

wiretap requests mirrors the language in this original request, but for some additional

information obtained through the course of the taps.  It was through this tap of

McDuffie's phone that law enforcement was led to David Wilkins, and therefore the

information in the McDuffie Affidavit is pivotal in determining whether all the wiretap

authorizations which proceeded from it were valid.

An investigation involving firearm sales and narcotics trafficking concentrating on the

"Rangel Houses" in the Bronx began in 2004.  Apparently based on this investigation 12

people were arrested in January, 2005.  (None of them are named in the present

indictment.)  A defendant in that arrest became a cooperating witness (CW) who worked

with police to secure the McDuffie-wiretap authorization.

   According to the affidavit police also worked with a confidential informant (CI)

through whom they made controlled buys of cocaine from McDuffie.  The CI on one date

wore a wire when defendant David Wilkins allegedly provided him with crack/cocaine.

On several occasions police set up surveillance locations and reviewed telephone toll

records to corroborate the CI's information, although at one point the Agent noted the CI

was no longer "reliable" in that he appeared to be involved anew in the drug trafficking

scheme. (See Bates 430, footnote.)

   An eavesdropping warrant was issued for McDuffie's phone and five subsequent

warrants issued on a monthly basis on phone numbers attributed to Wilkins.  (The

McDuffie wiretap was discontinued.)

   While the factual basis for the taps grew with each successive application, the language

detailing the necessity of the taps, i.e. why other less-intrusive methods could not be

employed—remained identical.  This memo will argue that the wiretapping was not

necessary to achieve the government's ends and how minimization requirements were not

met during the surveillance.


### POINT I

**THE ELECTRONIC EAVESDROPPING EVIDENCE
SHOULD BE SUPPRESSED ON THE GROUNDS THAT:
(1) THE GOVERNMENT FAILED TO ESTABLISH THAT THE
WIRETAP WAS NECESSARY; AND (2) THE AGENTS FAILED
<u>TO MINIMIZE THE INTRUSION.</u>**

The "bulwark of Fourth Amendment protection is, of course, the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Franks v. Delaware,* 438 U.S. 154 (1978). It is also fundamental that "the Fourth Amendment protects a person's private conversations as well as his private premises." *Alderman v. United States,* 394 U.S. 165, 178 (1968). Further, Title III was enacted as an additional safeguard both to protect the privacy of wire and oral communications, as well as a means of regulating "the use of electronic surveillance evidence obtained by law enforcement under specified conditions." *United States v. Lopez,* 300 F.3d 46, 51 (1st Cir. 2002), citing *Bartnicki v. Vopper,* 532 U.S. 514, 523 (2001). Thus, Title III considers the interception of electronic surveillance to be an "extraordinary investigative technique whose use 'is to be distinctly the exception and not the rule,'" *Lopez,* 300 F.3d at 51, quoting *United States v. Hoffman*, 832 F. 2d 1299, 1306 (1st Cir. 1987), available **only upon** satisfaction of strict procedural requirements.

## WIRETAPPING PHONES WAS NOT NECESSARY TO MEET THE GOVERNMENT'S OBJECTIVES

The Fourth Amendment requires that courts should authorize "no greater invasion of privacy…than *necessary* under the circumstances." *Berger v. State of N.Y.,* 388 U.S. 41, 57 (1967); *see also, Katz v. United States,* 389 U.S. 437 (1973).

Thus, the statue is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 p.12 (1974); *see also, United States v. Giordano,* 416

U.S. 505 (!974); *United States v. London*, 66 F.3d 1227, 1237 (1ˢᵗ Cir. 1995).  Such

traditional investigative techniques include, *inter alia;*

'*(1) standard visual and aural surveillance; (2) questioning and interrogation of*

*witnesses or participants (including the use of grand juries and the grant of immunity if*

*necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by*

*undercover agents or informants. Van Meter*, 278 F.3d 11561163-64 (9ᵗʰ Cir. 1002).

Where those traditional techniques have not been attempted, the government must

"explain that failure with particularity." *United States v. Cline*, 349 F.3d 1276, 1280 (10ᵗʰ

Cir. 2003).  It is therefore insufficient to recite mere generalities or conclusory statements

without detailed factual support. *Id.; see also, United States v. Lopez,* 300 F.3d 46, 53 (1ˢᵗ

Cir. 2004).

Unlike some statutory provisions, the requirement for a "full and complete statement'

about the failure to utilize other investigative procedures is "absolute."  *United States v.*

*Salemme,* 978 F.Supp. 343, 348 (D.Mass. 1997).  Suppression may be required where

applications are incomplete or misleading in this regard, as the "constitutionality of Title

III relies in meaningful measure on the process it provides for an independent judicial

officer, rather than a law enforcement officer…to decide that electronic surveillance is

necessary."  *Id; see also, Steagald v. United States,* 451 U.S. 204, 212 (1981); *Johnson v.*

*United States,* 333 U.S. 10, 14 (1948).

Yet these statutory conditions are 'far from an insurmountable hurdle,' and require

only that the government demonstrate 'that normal investigative techniques would prove

difficult; and not that any other option would be doomed to failure."  *United States v.*

*Pappas,* 298 F.Supp.2d 250 (D.Conn. 2004), quoting *United States v. Young,* 822 F.2d

1234, 1237 (2nd Cir. 1987).  When reviewing "necessity," courts employ a "common sense approach" to evaluate the reasonableness of the government's claims.  *United States v. Gonzalez,* 412 F.2d 1102, 1112 (9th Circ. 2005).

   In the present case the objectives of the wire tapping were wide in scope.  The government believed Craig McDuffie (the original person wiretapped which ultimately led to Defendant Wilkins) was part of a narcotics and money laundering conspiracy.  The tap was intended to discover, *inter alia*, the extent of the operation, the identities of McDuffie's accomplices, and the locations of contraband and proceeds from those activities.

   While the affidavit sworn to by DEA Agent Dante Gray comprised some 32-pages, the paragraphs describing the 'necessity' for the wiretap and explaining other less intrusive police actions attempted and not attempted only comprise seven pages.  The language is largely boilerplate and is repeated verbatim in all five subsequent wiretap applications even though clearly more information had been gathered through the prior wiretaps and arguably the need for continued surveillance was lessened.

   In each application Agent Gray, and then Agent Danielle Rauen acknowledge that they had sufficient probable cause to arrest first Craig McDuffie then David Wilkins but decide that doing so would leave their objectives "unfulfilled" in that neither would cooperate or have "little or no knowledge" about the larger scheme police were attempting to penetrate.  (Gray Affidavit, Bates 284, graph (a); Rauen Affidavit, Bates 450 (a).)

   This assumption is conclusory without any explanation pinned to the particular characteristics of these defendants or this investigation.  Contrary to what the Agents

state, the very investigation they submit would not produce positive results from the arrest of suspects or continued surveillance was actually based on the arrest of 12 people and the cooperation of at least one of them who became the CI in the present case.

The mere assumption that less intrusive methods would be unavailing is insufficient to justify the necessity of the warrant.  If law enforcement were permitted to merely peremptorily state the futility of trying old-fashioned, tried and true police methods without actually trying those methods first, it would render moot the 'necessity' requirement of Title III.

The warrant goes on to describe the following categories it deemed *a priori* futile:

-Confidential Informants and Cooperating Witnesses,
-Undercover Agents,
-Surveillance,
-Telephone Toll Records,
-Grand Jury,
-Witness Interviews, and
-Search Warrants,

Yet, contrary to their claim of anticipated failure, many of the methods, such as using confidential informants, cooperating witnesses, undercover agents, and toll records had already proved successful in the case.   The fact that these less-intrusive police methods had proved successful, militates against the *necessity* of tapping phone lines.

In sweepingly general language, the agents argue that the other methods listed above (such as interviewing witnesses, added surveillance, search warrants, etc.) would not prove fruitful because they are "limited; would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation."  (Gray, Bates 289(g); Rauen, Bates 455(e).)

The affidavits state that video surveillance would be unavailing since there was only one entrance to the building complexes being watched. While counsel doesn't pretend to be an expert in surveillance methods, it seems probable that one entrance might actually facilitate photographing and observing who enters and exits a group of buildings.

As the court stated in *United States v. Gonzalez, supra* at 1114:

Although the affidavit claimed that neither physical nor video surveillance was likely to produce useful information…we cannot accept this as evidence that such surveillance was reasonably unlikely to bear fruit. Surely surveillance is not completely unsuccessful if it does not decipher what an individual is writing while she sits are her desk…it is still reasonable to conclude that video or physical surveillance could have identified individuals…coming and going from the office. This information certainly would have assisted law enforcement in discovering the identities of member of the criminal enterprise and aiders and abettors.

According to the court in *United States v. Blackmon,* 273 F.3d 1204 12, 10-11 (9th cir. 2001), these kinds of remarks are simply "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures."

Without being willing to explore traditional, less-invasive police methods such as tracking down and interrogating witnesses, making arrests and securing cooperation, the government contends that in any case involving multiple suspects, it is more effective to wiretap. While it's true that tapping phones may be the easiest way to investigate crime, courts have set perimeters to this investigatory tool exactly because it could easily become the tool of choice in every investigation thereby obliterating any protection against the invasion of privacy for anyone who uses a telephone. The government should be held to its burden of paying more than a cursory nod to less-invasive investigatory techniques before a wiretap is condoned. (See also *U.S. v. Lilla*, 699 F.2d 99, C.A.N.Y. 1983, and cases cited therein.)

In the present case traditional investigatory techniques were insufficiently explored to justify the necessity for wiretapping.  The conversations overheard through these taps should, thus, be suppressed.

## AGENTS DID NOT SUFFICIENTLY MINIMIZE THEIR SURVEILLANCE

18 U.S.C. 2518(5) mandates that eavesdropping orders "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter."  "The minimization requirement 'spotlights the interest in confining intrusions as narrowly as possible so as not to tread impermissibly upon the personal lies and privacy of wiretap targets and those who, often innocently, come into contact with such suspects.'" *United States v. Lopez,* 300 F.3d at 57, *supra,* quoting *United States v. Hawkins,* 279 F.3d 83, 85 (1st Cir. 2002).  When attempting to meet its obligation to minimize unauthorized communications, "the government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required.'"  *United States v. Charles,* 213 F.3d 10, 22 (1st Cir.), *cert denied,* 531 U.S. 915 (2000), quoting *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir. 1989).

In *Scott v. United States,* 436 U.S. 128, 139 (1978), the Supreme Court indicated that the government's minimization efforts should be evaluated on a case by case basis.  *See also, United States v. Napolitano,* 552 F. Supp. 465, 476 (S.D.N.Y. 1979).  Relevant considerations include:  the number of targeted individual; the ambiguity of the intercepted conversations; the complexity of the acts and nature of the suspected crimes; the thoroughness of the government's precautions to bring about minimization; and the degree of judicial supervision over the surveillance process. *See, United States v. Ozar,*

50 F.3d at 1147, *supra; United States v. London,* 66 F.3d 1227, 1236 (1st Cir. 1995);

*United States v. Garcia,* 785 F.2d 214, 224 (8th Cir.), *cert. denied,* 475 U.S. 1143 (1986).

In this case, while the court ordered that the interceptions "be conducted in a such a way as to minimize the interception of wire communications not otherwise subject to interception under Ch.119 of Title 18," (Order, B.299), the court gave no instruction on how this minimization should occur.  Thereby there is no independent way to determine what uniform factors agents used to accomplish minimization.  And while calls some calls were minimized, the percentage of calls minimized was so low as to put into doubt whether any specific procedure was followed.

Over the course of the six-months of wiretapping the breakdown relating to minimization and pertinent calls is as follows:

First Affidavit,

1st Periodic Report:  Only 80 out of 1600 calls were minimized (.05%), and only 25 were identified as pertinent.

2nd Periodic Report:  Only 43 out of 2137 calls were minimized, and only 52 were identified as pertinent.

3rd Period Report:  Only 37 calls were minimized out of 2039, and only 202 identified as pertinent.

Second Affidavit,

1st Periodic Report: Only 77 were minimized out of 1833, with only 134 calls found to be pertinent.

2nd Periodic Report:  Only 84 calls were minimized out of 1398, with 116 found to be pertinent.

<u>Third Affidavit</u>,

   1st Periodic Report:  Only 7 calls were minimized out of 173, and 7 calls found to be pertinent.

   2nd Periodic Report:  Only 63 calls were minimized out of 1429, with 71 found to be pertinent.

<u>Fourth Affidavit</u>:

   1st Periodic Report:  116 calls were minimized out of 1352, and only 62 calls found to be pertinent.

   2nd Periodic Report:  Only 66 calls were minimized out of 760 and 55 found pertinent.

<u>Final Affidavit</u>:

   1st Periodic Report:  Only 111 calls were minimized out of 2064 with only 53 found to be pertinent.

   2nd Periodic Report: Only 75 calls were minimized out of 1523, with only 62 found to be pertinent.

   3rd Periodic Report:  Only 120 calls were minimized out of 1213 calls and only 36 found to be permanent.

   Based on the above information, the number of calls minimized over the six-month wiretap was less than 10% of the calls overheard and an even smaller percentage were deemed pertinent in each periodic report.  This begs the question, if so few calls percentage-wise were deemed pertinent, why weren't fewer calls minimized? *Compare, People v. Holder,* 69 Misc.2d 863 (Nassau County Ct. 1972) (Suppressing where fewer than 10% of the intercepted calls were relevant to the conspiracy); *People v. Castania,* 73 Misc.2d 166 (Monroe County Ct. 1973) (minimization had not been

achieved where 23.6% of calls were pertinent); U*nited States v. Ianiello,* 621 F.Supp.

1455, 1470 (S.D.N.Y. 1985) (No suppression where 80% of calls regarding contested

period related to narcotics); *United States v. Manfredi,*488 F.2d 588 (2nd Cir.1973)(No

suppression where 800 of 1000 calls were not pertinent). While "blind reliance on the

percentage of nonpertinent calls intercepted is not a sure guide to the correct answer"

with regard to minimization, *Scott v. United States,* 436 U.S. 128, 140 (1978), there is

also no question that such percentages are an important factors. *Id; see also, United

States v. Gray,* 372 F.Supp.2d 1025 (N.D. Ohio 2005).

### POINT II

**PURSUANT TO THE DUE PROCESS CLAUSE
AND THE SIXTH AMENDMENT, THE COURT
SHOULD DIRECT THE GOVERNMENT TO
TRANSCRIBE ALL OF THE INTERCEPTED
COMMUNICATIONS, IDENTIFY THOSE IT
DEEMS TO BE EITHER INCULPATORY OR
EXCULPATORY, INDICATE WHICH TAPES
IT INTENDS TO OFFER INTO EVIDENCE,
AND SPECIFY WHICH CONVERSATIONS
DEFENDANT EITHER PARTICIPATED IN
OR WAS THE SUBJECCT OF DISCUSSION BY
OTHERS**

   The government has provided counsel with thousands of line reports and recordings

relating to the wire taps in this case.  While it has separated those calls among the various

defendants, counsel is overwhelmed by the sheer number of calls and requests the court

direct the government to transcribe all of the intercepted communications verbatim, and

identify which tapes it intends to offer into evidence.

   Although the Constitution does not expressly require pretrial discovery in criminal

cases, *see e.g., Deviate v. Sills,* 422 F.2d 1172, 1181 (3rd Cir.1970), certain constitutional

provision have been interpreted as imposing a duty of disclosure upon the government.

Thus the Due Process clause required the government to disclose material evidence,

favorable to the defense, even if no specifically requested by the defense.  *See, United*

*States v. Agars,* 427 U.S. 97, 107 (1973); *Brady v. Maryland,* 373 U.S. 83, 87 (1963).

Whether or not the evidence is admissible under evidentiary rules, "*Brady* material must

be disclosed in time for its effective use at trial," *In Re United States (Coppa),* 267 F.3d

132, 142 (2nd Cir. 2001).

   Similarly, the sixth Amendment contains separate guarantees of effective assistance of

counsel, confrontation and compulsory process.  Counsel is ineffective where he neglects

to take the necessary steps to investigate and discover important trial materials.  *See*

*generally, People v. Droz,* 39 N.Y.2d 457, 462 (1976).  And a defendant is deprived of

his right of confrontation and compulsory process when he is unreasonably precluded

from obtaining and introducing material evidence.  The Supreme Court has repeatedly

recognized that the guarantees encompassed in various constitutional provisions cannot

be vindicated without at least some degree of pretrial discovery.  And for the same

reason, the federal statutes and rules set forth procedures enabling the defense to obtain

specific types of information at various stages of the proceedings.

   It is in this context that a number of courts have criticized prosecutors who attempt to

"bury the defendant in paper" by simply making all documents available, without

organizing them in some more utile manner.  For example, in *United States v. Turkish,*

458 F.Supp. 874 (S.D.N.Y. 1978), the government supplied the defense with 25,000

pages of documents.  Arguing that such discovery amounted to "burying the defendant in

paper," the defense asked the government to identify which documents it intended to use

at trial.  Without significant discussion, the court agreed and granted the application. 458

F.Supp. at 882.

  Citing *Turkish,* the same request was granted in *United States v. Poindexter,* 727

F.Supp. 1470 (D.D.C. 1989).  In that case, the government also produced thousands of

pages of documents during discovery.  But the court noted that there was "no reason why

the government could not be more specific as to which documents it currently intends to

use, and there are may reasons, in fairness to the defendant, the protection of his rights

and not least rule 16(a)91), why it should be."  727 F.Supp. at 1484.  *Accord, United*

*States v. Weissman,* 1996 WL 751385 (S.D.N.Y. 1996)("the government does not satisfy

[its obligation under the rules] by producing masses of documents without designating

which of them it will seek to introduce at trial.")  *See also United States v. Upton,* 856

F.Supp. 727 (E.D.N.Y. 1994), *aff'd,* 78 F.3d 65 (2nd Cir. 1996); *United States v.*

*Bortnovsky,* 820 F.2d 575 (2nd Cir. 1987.)

  In *United States v. Nahamie*, 91 F.Supp.2d 565 (S.D.N.Y. 2000), the court disagreed

that any foregoing decisions amounted to persuasive precedent that the Federal Rules of

Criminal Procedure required the government to identify those documents which it

intended to rely during its case-in-chief; nevertheless, the court concluded that the

government was obligated to provide more specifics as to the basis for its allegations of

Medicare fraud.  In that case, the government produced over 200,000 pieces of paper in

hundreds of boxes and files.  Relying on *Bortnovsky,* the court determined the

government had not met its obligation of providing adequate notice to the defense.

  Though these cases take different approaches and impose different remedies, each of

them recognize that, where the volume of documentation is so great that it overwhelms

the resources of the defense to review and organize the materials, the disclosure of the uncategorized documents may, in effect, be the equivalent of complete non-disclosure. Thus, these cases, considered together, stand for the proposition that the government cannot evade the rules governing discovery by "burying the defense in paper"; where the volume of materials is staggering, the government must make reasonable efforts to organize the materials in a comprehensible format.  Moreover, these decisions vindicate the defendant's rights under the Due Process clause and the sixth Amendment by ensuring that they are provided with usable discovery in sufficient time to prepare for trial and present a defense.

For all the foregoing reasons, the government should be directed to transcribe all of the intercepted communications verbatim, identify those which it intends to offer into evidence, and indicate which communications it deems to be either inculpatory or exculpatory.

**POINT III**

**PURSUANT TO THE FEDERAL RULES, THE COURT SHOULD DIRECT THE GOVERNMENT TO PROVIDE THIRTY DAYS IN ADVANCE OF TRIAL: ALL EXHIBITS EXPECTED TO BE OFFERED DURING ITS DIRECT CASE; (2) A LIST OF ANTICIPATED WITNESSES; (3) A LIST OF ALL UNINDICTED COCONSPIRATORS; (4) A SUMMARY OF EXPERT TESTIMONY; AND (5) NOTICE OF ANY UNCHARGED CRIMES AND PRIOR BAD ACTS EVIDENCE IT MAY SEEK TO OFFER INTO <u>EVIDENCE</u>**

Subdivision (a)(1) of Fed. R. Crim. P. 16 provides that:

> "Upon request of the defendant, the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, building or places, or copies or portions thereof, which are within the possession, custody, or control o of the government and which are material to the preparation of the

> defendant's defense or are intended for use by the government as evidence in chief at trial, or were obtained from or belong to the  defendant."

*See generally, United States v. Armstrong,* 517 U.S. 456, 462-63 (1996); *United States v. Maniktala,* 934 F.2d 25, 28 (2nd cir. 1981).  While the government ordinarily may comply with this obligation just by providing the defense with access to a collection of documents, more specificity may be required where the volume of documents is considerable.  *See, United States v. Marino,* 639 F.2d 882, 889 (2nd Cir. 1981).

Similarly other rules require the government to give notice of its intent to introduce certain evidence in sufficient time in advance of trial or hearing to allow the defendant to raise objections.  *See e.g.* Fed. R. Crim P. 807 [residual exception to hearsay rule]; Fed. R. Crim. P. 609 [regarding impeachment evidence of convictions]; *see also,* Fed. R. Crim P. 12(d).  Most notably, Fed. R. Evid. 404(b) declares that, 'upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial of the general nature of any such evidence [of other crimes, wrongs or acts] it intends to introduce at trial."

The underlying policy of these rules if "to reduce surprise and promote early resolution on the issue of admissibility." *United States v. Perez-Tosta,* 36 F.3d 1552, 1561 (11th Cir. 1994), *see also, United States v. Cruz,* 363 F.2d 187, 196 n.2 (2nd Cir. 2004)(regarding expert testimony); *United States v. Garcia,* 291 F.3d 127, 136 (2nd Cir. 2002)(regarding 404(b) evidence.  Where notice is reasonable depends upon a number of factors, such as the circumstances in which the prosecution discovered the evidence, the motivations of the prosecution, the significance of the evidence and the prejudice suffered by the defendant due to the notice not occurring sooner.  *See generally, United States v. Euceda-*

*Hernandez,* 768 F.2d 1307, 1313 (11th cir. 1985); *United States v. Doe,* 860 F.2d 488 (1st

Cir. 1988).

In this case the need for early discovery is manifest.  As already discussed the

government has provided in DVD-form hundreds of pages of line sheets, along with

thousands of hours of tape recordings.  None of the conversations have been transcribed

or indexed in any meaningful way.

Accordingly we ask the Court direct the government provide the following items thirty

days in advance of trial:  1) a list of anticipated witnesses, *see, United States v. Giffen*,

379 F.Supp.2d at 345, *supra (*directing that the list be provided ten days before trial);

*accord, United States v. Lino,* 2001 WL 8356, 20 (S.D.N.Y. 2001)(granting request for

witness list, notwithstanding that no specialized need had been demonstrated); 2) a list of

anticipated exhibits, and copies of those exhibits, *see, United States v. Giffen,* 379

F.supp.2d 337, 344 (S.D.N.Y.2004)(directing that notice be provided 30 days before

trial); 3) names of unindicted co-conspirators, *see, United States v. Nachamie,* 91

F.Supp.2d at 572, *supra, United States v. Lino,* 2001 WL 8356, 12 (S.D.N.Y. 2001), and

4) a summary of any anticipated expert testimony.  *See,* 18 U.S.C. 892.

In particular, we ask the Court to direct the prompt disclosure of any prior bad acts of

uncharged crimes the government intends to offer.  As noted earlier, Fed. R. Evid. 404(b)

now explicitly preconditions the admission of prior uncharged crimes or bad acts upon

"reasonable notice" to the defense.  The rule states that, "upon request by the accused, the

prosecution in a criminal case shall provide reasonable notice in advance of trial, or

during trial if the court excuses pretrial notice on good cause shown, of the general nature

of any such evidence it intends to introduce at trial."  Thus, the government has the

burden of establishing "good cause" in order to delay notice until trial. Depending on the circumstances, courts have held that "reasonable notice" amounts to two weeks before trial. *See, United States v. Evangelista,* 813 F.Supp. 294, 302 (D.N.J. 1993).

Considering the complexity of this case, we believe it is reasonable to ask the Court to direct the government to provide such notice thirty days before trial. Under ordinary circumstance the admissibility of 404(b) evidence tends to be one of the most contentious trial issues, as it involves several difficult analytical inquiries. Basically, in order to admit uncharged crimes of "bad act" evidence, courts must: 1) determine that the evidence is "offered for a proper purpose"; 2) determine that the evidence is "relevant"; 3) determine that its probative value outweighs its prejudicial effect under Rule 403; and 4) upon request, the court must charge the jury to consider the evidence only for its limited purpose. *Huddleston v. United States,* 485 U.S. 682, 691-92 (1988).

Here, because of the number of defendants charged and the duration of the conspiracy, it appears the government will seek to introduce a plethora of evidence of uncharged crimes and prior bad acts. By requiring the government to provide notice of 404(b) evidence one month before trial, the Court will enable the parties to litigate the admissibility of such evidence fully, as well as allow itself ample time to reach thoughtful decisions.

Accordingly, we ask the Court to direct the disclosure of the aforementioned evidence no later than thirty days before trial.

## POINT IV

**PURSUANT TO *BRADY* AND ITS PROGENY THE COURT SHOULD DIRECT THE GOVERNMENT TO DISCLOSE, AS SOON AS IT BECOMES AVAILABLE, ANY MATERIAL THAT IS EITHER EXCULPATORY, USEFUL FOR PURPOSES**

### OF CROSS-EXAMINATION, OR HELPFUL IN DISCOVERING OTHER INFORMATION

As alluded to earlier, there is no question that the Due Process Clause obligates the government to disclose "material evidence." In *Brady v. Maryland,* 373 U.S. at 87, *supra,* the Supreme Court declared that:

> "The suppression by the prosecution of evidence favorable to the accused Upon request violates due process where the evidence is material either To guilt or to punishment, irrespective of the good fair or bad faith of the Prosecution." *See also, United Stares v. Gill,* 297 F.3d93, 101 (2nd Cir. 2002).

Since then, the Supreme Court has added that the government has a general duty to disclose information with obviously exculpatory value, even when no request has been made. *United States v. Agurs,* 427 U.S. at 103, *supra.* The government's duty of disclosure is also codified in Rule 16 of the Federal Rules of Criminal Procedure, which provides that the government, upon request, must provide, *inter alia,* documents or tangible objects if: 1) they are material to the preparation of the defense, 2) the government intends to offer them as evidence in its case in chief; or 3) they were obtained from or belong to the defendant.

Often the key question in evaluating *Brady* claims is whether the items sought are "material." Simply put, evidence is "favorable" if it tends to show that the accused is not guilty or if it impeaches a government witness. Thus, there is no distinction, for purposes of *Brady* "between impeachment evidence and exculpatory evidence." *United States v. Bagley,* 473 U.S. 667, 676 (1985).

Further, though "one consideration that bears on *Brady* materiality is admissibility," it is sufficient that the item in question is either partly admissible, could lead to admissible evidence or "would be an effective tool in disciplining witnesses during cross-

24

examination by refreshment of recollection or otherwise." *United States v. Gill,* 297 F.3d at 104, *supra.*

Harmless error analysis is superfluous once it is determined that material evidence has been withheld. *See, United States v. Ellis,* 121 F.3d 908, 916 (4th Cir. 1997).

Importantly, "the mandate of *Brady* extends beyond any particular prosecutor's actual knowledge*." People v. Wright*, 86 N.Y.2d 591, 598 (1995). "[The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 115 S.Ct. at 1567.

Though there is no general duty to disclose *Brady* material before trial, the Second circuit has made clear that "*Brady* underlined material must be disclosed in time for its effective use at trial." *In Re United States v. Coppa,* 267 F.3d 132, 142 (2nd Cir. 2001) (emphasis added.) To permit the prosecution to decide when *Brady* material should be disclosed would be "to permit the prosecution to control, to some extent, the preparation of a defense." *United States v. Crozzoli,* 698 F.Supp. 430, 436-37 (E.D.N.Y. 1988).

These principles make it incumbent upon the Court to direct the government, explicitly, to disclose any *Brady* material in its possession as soon as it becomes available. While prosecutors inevitably protest that they are aware of their obligation sunder *Brady* such pronouncements do not obviate the need for an express order form the Court. Moreover, we ask the Court to direct the government to provide certain specific items that generally fall within the ambit of *Brady* material, including: any pea agreements, cooperation agreements, proffer agreements or similar arrangements that might arguably impact the interest, motive or bias of a prosecution witness; statement of

prosecution witnesses that reveal any exculpatory information, as well as any

inconsistencies with prior statements of those or any other witnesses; and background

information about the informants impacting their credibility, such as criminal records and

history of bad acts.

### POINT V

**THE COURT SHOULD RULE, *IN LIMINE*, THAT THE STATEMENTS CONTAINED IN THE EAVESDROPPING APPLICATION LINE SHEETS AND PROGRESS REPORTS ARE ADMISSIBLE AGAINST THE GOVERNMENT, IN THE EVENT THEY CONFLICT WITH THE GOVERNMENT'S <u>TRIAL ALLEGATIONS</u>**

It is fundamental that "statements made by an attorney concerning a matter within his

employment may be admissible against the party retaining the attorney." *United States v.*

*Margiotta,* 662 F.2d 131, 142 (2nd Cir. 1981), *cert. denied.,*461 U.S. 913 (1983).

Similarly, pleadings may be considered admissions of a part-opponent, admissible against

a party in the original litigation as well as subsequent litigation.  *See generally,*

*Contractor Utility Sales Co. v. Certain-Teed Products Corp.,* 638 F.2d 1061, 1084 (7th

Cir. 1981).  Accordingly, we submit that that the statements contained in the various

eavesdropping applications, line sheets and progress reports are potentially admissible

against the government, in the event that they conflict with the government's position at

trial.  We ask the Court to consider this issue now because of the likelihood that such a

conflict will arise and to assist the parties in trial preparation.

Fed. R. Evid. 801(d) provides that a statement is not hearsay if it qualifies as an

"admission by party-opponent," which it defines, in pertinent part, as either the party's

own statement, or:

   "(B) a statement of which the party has manifested an adoption or belief in the truth,

Or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent, or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship…"

The concept of party-admissions in criminal cases was discussed most famously in *United States v. Mckeon,* 738 F.2d 26 (2nd Cir. 1994), where the second circuit condoned the judge's decision to admit portions of defense counsel's opening statement from a prior trial, which had ended in a hung jury. Initially, the Second Circuit agreed that statements made by an attorney—including opening statements from a prior trial—may be admissible against the party retaining that attorney. 738 F.2d at 30 citing *United States v. Margiotta,* 662 F.2d at 142, *supra.* The court declared that "prior opening statements are not *per se* inadmissible in criminal cases," for a contrary holding would "invite abuse and sharp practice and would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings." 738 F.2d at 31.

The Second Circuit proclaimed the following rules:

"Before permitting such use, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial. Speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted. The inconsistency, moreover, should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial. The court must further determine that the statements of counsel were such as to be the equivalent of testimonial statements by the defendant. The formal relationship of the lawyer as agent and the client as principal by itself will rarely suffice to show this since, while clients authorize their attorneys to acts on their behalf, considerable delegation is normally involved and such delegation tends to drain the evidentiary value from such statements. Some participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant." *Id.*

Many courts have reaffirmed the vitality of *McKeon,* usually in the context of defense attempts to introduce prior statements by prosecutors or other government agents. *See, United States v. DeLoach,* 34 F.3d 1001, 1005 (11th Cir. 1994); *United States v.*

*Concepcion,* 983 F.2d 369, 393 (2nd Cir. 1993). Indeed some courts have concluded that

there is even greater leeway for introducing prior statements by government agents.

For example in *United States v. Bakshinian,* 65 F.Supp.2d 1104 (C.D. Calif. 1999), the

question was whether to admit a statement made by a prosecutor in the closing argument

of a co-defendant's trial. At the outset, the court agreed that under the Federal Rules, a

prosecutor is the agent for the federal government, so that statements the prosecutor

makes may be admissible against the government under the "party-opponent rule." 65

F.Supp 2d at 1106; *see also, United States v. Salerno,* 937 F.2d 797, 811-12 (2nd cir.

1991). But the court proceeded to find that the various protections discussed in *McKeon*

need not apply where the statement in question is attributed to the government, rather

than the defense.

First, the court observed that the defense "is entitled to greater leeway than the

government because the defense need not prove anything." 65 F.Supp.2d at 1108.

further the government is prohibited from taking inconsistent positions between trials.

"Thus, the fact that the government's statements in a previous trial might be admitted in a

later trial will not hinder proper advocacy by the government." *Id.* Additionally, when

the question is whether to admit a prosecutor's statement, there are no concerns arising

out of the Fifth Amendment, the right to counsel or attorney-client privilege. *Id.* For

these reasons, the court declined to apply the *McKeon* factors and, instead, elected to

"consider the admissibility of the government prosecutor's statement in a manner similar

to any statement offered pursuant to Rule 801(d)(2)(D)." *Id; see also, United States v.*

*Amato,* 356 F.3d 216, 219-20 (2nd Cir. 2004)(it was unnecessary for the trial court to

apply the *McKeon* factors when considering whether to admit a pretrial letter form defendant's prior counsel.)

Whatever the precise analysis, these cases unanimously hold that statements by prosecutors or government agents may be admitted as "party-admissions" where they conflict with the government's trial position. And courts have applied the same logic when considering specifically whether to admit statements made by case agents in pretrial affidavits. *See, United States v. Warren,* 42 F.3d 647, 655 (D.C.Cir. 1994)(court abused its discretion in barring an officer's statement in a criminal complaint. The statement was relevant and admissible under Rule 801, as non-hearsay statement offered against the government, in which the government had manifested or adopted a belief in its truth.)

While it would be premature at this point to identify which of these statements might conflict with the government's trial position, we nevertheless ask the Court to rule, *in limine,* that the statement in those documents amount to party-admissions and, consequently, are admissible pursuant to Fed.R. Evid. 801. Such a pretrial ruling will better enable the parties to prepare for trial. Indeed, a ruling on the admissibility of those statements could significantly affect how witnesses may or may not be cross-examined. Should the court rule that the statements in the various eavesdropping applications, progress reports and line sheets are admissible, then the parties can concentrate, at trial, on the subsidiary question of whether the statements otherwise should e admitted pursuant to Rule 401 and Rule 403. *See, United States v. Bakshinian,* 65 F.Supp.2d at 1110, *supra.*

**POINT VI**

**DEFENDANT REQUESTS PERMISSION TO JOIN IN THE
MOTIONS SUBMITTED BY CO-DEFENDANTS TO THE EXTENT
THAT THEY ARE RELEVANT AND APPLICABLE, AND FOR ANY
OTHER RELIEF THAT THE COURT MAY DEEM JUST AND
<u>PROPER</u>**

**CONCLUSION**

**<u>THE MOTION SHOULD BE GRANTED IN ALL RESPECTS</u>**

Dated:  April 11, 2008
        New York, NY

Respectfully submitted,

_____
TONI MESSINA, ESQ.
Attorney for Defendant
 David Wilkins
 100 Lafayette Street, Suite 502
 New York, NY 10013